```
                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF VERMONT
```

UNITED STATES OF AMERICA         :
                                 :
        v.                       :
                                 : File No. 1:08-CR-59-1, -3, -4
JOHN BELANGER, JACK LEVY         :
and CARLOS CINTRON,              :
          Defendants.            :

                        OPINION AND ORDER
                  (Papers 54, 55, 56, 57, 58)

I.  Introduction

Defendants John Belanger, Jack Levy and Carlos Cintron were indicted May 22, 2008 on charges of conspiracy to distribute marijuana in excess of 50 kilograms in violation of 21 U.S.C. 846, 841(a), and 841(b)(1)(C) and forfeiture under 21 U.S.C. 853. The charges arise from a Border Patrol stop of Defendants' vehicle on the evening of May 7, 2008. Before the Court are Defendants' Motions to Suppress all evidence seized and statements made and to Dismiss all charges. For the reasons set forth below, Defendants' Motions are DENIED.

II. Factual Background

On the evening of May 7, 2008, between 6:00 p.m. and 7:00 p.m., a sensor placed by United States Border Patrol near the Canadian border in Holland, Vermont activated. The area is described by the Border Patrol as "notorious" for narcotics and illegal alien smuggling. Border Patrol Agents ("BPAs") Lavallee,

                                 1

Walsh and Graciano responded to the sensor activation by setting up surveillance in the Holland, Vermont area. At approximately 9:45 p.m., BPA Walsh observed and notified the other agents of a black minivan and SUV traveling "in tandem" north on Mead Hill Road, entering Valley Road and then proceeding onto Holland Pond Road.

At approximately 10:25 p.m., BPA Graciano reported a dark colored minivan heading east on Prairie Road toward Holland Pond Road turn off its lights and then, a minute later, turn them on again in the same location. Prairie Road is an east-west road that parallels the Canadian border approximately 200 yards south of the international boundary. BPA Walsh then observed a black SUV also traveling east on Prairie Road with a Vermont license plate number "ERA906." A records check revealed no registration record for that plate in Vermont.

At approximately 10:34 p.m., BPA Lavallee observed a black minivan heading southbound on Holland Pond Road, which appeared to be traveling 25 m.p.h. in a posted 35 m.p.h zone. BPAs Lavalle and Walsh pulled out to follow the minivan, which increased its speed to approximately 50 m.p.h. A registration check revealed the minivan was registered to ELRAC, Inc., a New Jersey car rental company. The van traveled past a yield sign without braking and continued on Valley Road toward Mead Hill Road. Based on the foregoing facts and the area's reputation for

alien and narcotic smuggling, BPAs Lavallee and Walsh stopped the minivan near the Mead Hill Road intersection to conduct an immigration inspection.

As Lavallee approached the van, he observed a large black duffle bag in the back, which, based on his experience and training, he determined was consistent with marijuana smuggling. Lavallee identified himself to the driver as a Border Patrol Agent and asked for identification. He observed the driver, Mathieu Desrochers, visibly shaking when he attempted to remove an identification card from his wallet. Desrochers told Lavalle he was a citizen of "Quebec", had entered the U.S. about a week ago and that a friend had rented the minivan. Lavallee asked Desrochers for permission to search the van and Desrochers responded he was unsure and asked if he had to consent. BPA Lavallee responded that he did not, and a canine unit was en route to their location. Lavallee conducted a <u>Terry</u> frisk, handcuffed Desrochers and placed him in the back of his vehicle for investigatory detention. Lavallee advised Desrochers he was not under arrest and that he was handcuffed because the officers were concerned for their and his safety.

At approximately 10:40 p.m., BPAs Graciano and Chamberlain arrived at Desrochers' minivan with service canine "Reno" to perform a drug sniff. Reno alerted to the presence of concealed humans or narcotics in the rear of the minivan. The BPAs opened

the tailgate, and Reno again alerted on the van's interior. The BPAs then opened one of three black duffle bags and found vacuum wrapped plastic bags containing what appeared to be marijuana. A search of the van yielded four duffle bags containing over 200 pounds of marijuana, a small backpack containing about $242,410 in U.S. currency and a Magellan GPS unit.

Before the canine unit arrived, Lavallee and Walsh saw a vehicle traveling southbound on Holland Pond Road. The vehicle appeared to stop and abruptly turn west on Valley Road. The BPAs believed the vehicle may be the same black SUV seen traveling in tandem with Desrochers' minivan an hour earlier. BPA Nguyen, who had just arrived to assist Lavallee, stopped the SUV and confirmed it had the same license plate as the vehicle Agent Walsh observed earlier on Prairie Road. Inside the vehicle were Defendants Levy, Belanger and Cintron. Levy was driving and possessed appropriate identification. Belanger, seated in the front passenger seat, and Cintron, in the back seat, did not have identification. Each defendant identified himself, and a record check revealed no outstanding warrants.

The registration certificate confirmed the Ford Explorer was owned by Cintron. When BPA Walsh asked him where he bought the vehicle, Cintron stated he thought he bought it near Boston, Massachusetts, but could not remember the exact location. The temporary registration certificate indicated Cintron purchased

4

the SUV May 2, 2008 for $763 and registered it in Vermont. When Walsh pointed out the Vermont registration, Cintron stated he might have bought the SUV in Vermont, but could not remember the exact location. Walsh asked Cintron when he bought the vehicle, and he responded that it could have been around April 1, 2008. Walsh asked Cintron if he bought it last week, and he said "maybe."

Walsh then questioned Belanger about where they were going. Belanger stated he was going to his girlfriend's house somewhere on Twin Bridges Road and that he was in Vermont because he wished to apply to the University of Vermont and wanted to know more about it. BPAs Nguyen, Walsh, and Johnson ordered Belanger, Cintron, and Levy out of the vehicle and separated them because their stories appeared conflicting and inconsistent. Cintron granted consent to search the Explorer, which yielded two GPS units and a cell phone.

Based upon these circumstances, BPA Lavallee advised Agent Walsh to detain Belanger, Cintron, and Levy and called Drug Enforcement Agency (DEA) Task Force Agent (TFA) Todd McCabe to initiate an investigation. Defendants were placed in separate vehicles and driven to the Newport Border Patrol Station to meet with DEA agents. At approximately 1:46 a.m., Cintron, who waived his Miranda rights, made statements incriminating himself, Levy and Belanger in drug smuggling during questioning by DEA agents.

DEA agents questioned Levy at approximately 2:56 a.m. and Belanger at approximately 4:51 a.m.

III. Discussion

Defendants assert their Fourth Amendment rights were violated because Border Patrol had no statutory authority to stop their vehicle, the stop was not supported by reasonable suspicion and their continued detention was unreasonable. Accordingly, Defendants move to suppress all evidence obtained and dismiss all charges against them.

A. Border Patrol's Authority

Defendants argue Border Patrol lacked authority to stop their vehicle because Border Patrol agents have statutory authority to enforce only immigration laws, and the BPAs here had no reason to believe Defendants' vehicle contained illegal aliens. The Court rejects this argument for two reasons.

First, neither the applicable statutes nor Supreme Court precedent support the premise that Border Patrol lacks authority to stop a vehicle on suspicion of illegal activity, no matter how strong the evidence, unless that activity involves violation of immigration laws. Under 8 U.S.C. 1357(a)(3), BPAs have power, without a warrant, and

> within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but

6

> not dwellings, for the purpose of patrolling the border
> to prevent the illegal entry of aliens into the United
> States.

The Supreme Court in Brignoni-Ponce limited this broad grant of authority in cases of suspected alien smuggling,[1] stating "officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975). In a later alien smuggling case, however, the Supreme Court appeared to expand the reach of the "reasonable suspicion" test, explaining that roving border patrol stops are permissible under the Fourth Amendment where, "based upon the whole picture, . . . experienced Border Patrol officers[] could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity." United States v. Cortez, 449 U.S. 411, 421-22 (1981)(emphasis added). The Fifth Circuit, the only Circuit Court to squarely address this issue, adopted the Cortez reasonable suspicion standard, holding "Border Patrol agents may make roving stops on the basis of reasonable suspicion of any

---

[1] The Brignoni-Ponce Court reserved the question "whether Border Patrol officers also may stop persons reasonably believed to be aliens when there is no reason to believe they are illegally in the country," because "the facts [did] not require a decision on that point," suggesting the Court's holding was limited to the facts of that case. 422 U.S. at 844.

7

criminal activity, and are not limited to suspicion of violation of immigration laws." United States v. Perkins, 352 F.3d 198, 200 (5th Cir. 2003) (citing Cortez, 449 U.S. at 421-22).

Moreover, BPAs have authority under 8 U.S.C. 1357(a)(5)(B) to make arrests for

> any felony cognizable under the laws of the United States, if the officer or employee has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.

The language "any felony" under 1357(a)(5)(B) plainly grants BPAs law enforcement authority beyond the purview of immigration law. Accordingly, the Court rejects Defendants' legal argument and finds BPAs have statutory enforcement authority beyond immigration law under both 8 U.S.C. 1357(a)(3) and (a)(5)(B).

Second, notwithstanding the Court's finding that BPAs have enforcement authority beyond immigration law, the Court disagrees with Defendants' factual argument that Border Patrol had no reason to suspect Defendants' vehicle may have contained illegal aliens. Border Patrol instituted surveillance because a sensor activation indicated possible foot traffic where Border Patrol recently observed substantial alien and drug trafficking. BPA Lavallee directed BPA Nguyen to stop Defendants' SUV because it was observed traveling "in tandem" with a vehicle driven by a "visibly shaking" Canadian national, very near the border, after

8

dark, in an area notorious for alien and drug smuggling. It was not possible for the BPAs to know *a priori* whether the sensor activation indicated alien or drug smuggling or if the SUV's occupants were legally present in the United States. The Court finds these facts, together with rational inferences therefrom, "reasonably warrant[ed] suspicion" that the vehicle may have contained persons in the country illegally. <u>Brignoni-Ponce</u>, 422 U.S. at 884. The Court recognizes, however, that the BPAs' decision to stop Defendants' vehicle was based, in part, on their suspicion that Desrochers and the Defendants were smuggling drugs. Therefore, the Court will also determine whether the vehicle stop was justified under 8 U.S.C. 1357(a)(3).

B. <u>The Vehicle Stop</u>

Border Patrol agents are authorized under 8 U.S.C. 1357(a)(3) to make roving stops on the basis of reasonable suspicion of criminal activity. <u>Cortez</u>, 449 U.S. at 421-22. Reasonable suspicion is established only where law enforcement can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion [on a citizen's liberty interest]." <u>Terry v. Ohio</u>, 392 U.S. 1, 21, (1968). Roving stops may not be based on an "inchoate and unparticularized suspicion or 'hunch'," <u>id.</u> at 27, however, "[t]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls

9

considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002).

When evaluating whether a stop was reasonable, courts "must consider the totality of the circumstances surrounding the stop." United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000) (citing United States v. Sokolow, 490 U.S. 1, 8 (1989)) (internal quotation marks omitted). A variety of factors may be relevant in this analysis. For example, law enforcement may consider the characteristics of the area in which they encounter a vehicle, such as its proximity to the border, normal traffic patterns on the road, and previous experience with smuggling and illegal border crossings in the area. See, e.g., Brignoni-Ponce, 422 U.S. at 884-85. Aspects of the vehicle itself may also justify suspicion. For instance, large vehicles with compartments for fold-down seats or spare tires are frequently used for smuggling aliens and drugs. See, e.g., id. at 885. In assessing the facts on the scene, officers are entitled to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273-74 (citing Cortez, 449 U.S. at 418).

The totality of the circumstances in this case suggest Border Patrol had more than sufficient basis to stop Defendants' vehicle. First, Border Patrol established surveillance of the

10

area because a sensor activation indicated possible human foot traffic in an area where smuggling recently had increased. Border Patrol later observed Defendants' SUV driving "in tandem" with a minivan, which Agent Lavallee testified based on his experience and training, was a common method for transporting large drug loads. Moreover, Border Patrol observed the vehicles traveling together after dark, in an area which typically has little traffic at that hour and is "notorious" for alien and narcotics smuggling. When BPAs stopped the minivan, they observed a large black duffle bag in the back and a records check revealed the minivan was rented. BPA Lavallee determined, based on his experience and training, these facts were also consistent with drug smuggling. The driver of the minivan was a Canadian national who was visibly shaking. The BPAs then observed a vehicle, which appeared to be the same SUV observed driving in tandem with the minivan, approach their location, but then make an "abrupt" turn.

These facts, when viewed "through the eyes of a reasonable and cautious [] officer on the scene, guided by his experience and training," strongly suggest the SUV's occupants may have been engaged in illegal activity. Bayless, 201 F.3d at 133. The Court therefore finds Border Patrol had authority under 8 U.S.C. 1357(a)(3) to stop Defendants' vehicle.

C.  <u>Detention</u>

Even if the initial stop of a vehicle was reasonable, the subsequent detention of its occupants violates the Fourth Amendment if it is unreasonable in scope or duration.  In evaluating the reasonableness of an investigative detention, the court must consider "whether the officer's action . . . was reasonably related in scope to the circumstances which justified the interference in the first place." <u>Terry</u>, 392 U.S. at 20.  "A critical factor in evaluating the intrusiveness of a stop is the length of the detention."  <u>United States v. Glover</u>, 957 F.2d 1004, 1011 (2d Cir. 1992).

There is no fixed standard for determining if the scope or length of a detention is reasonable; rather, Courts have recognized the "need to allow authorities to graduate their responses to the demands of any particular situation." <u>United States v. Place</u>, 462 U.S. 696, 709 n.10 (1983).  Thus, "[a]fter a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation."  <u>United States v. Givan</u>, 320 F.3d 452, 458 (3d Cir. 2003); cf. <u>United States v. Jenkins</u>, 452 F.3d 207, 213-14 (2d Cir. 2006) (facts arising after a stop may warrant further detention even where initial stop was the result of a mistake).

12

Likewise, reasonable suspicion can ripen into probable cause to detain a person if law enforcement, based on the totality of the circumstances, develops "a reasonable ground for belief of guilt" that is "particularized with respect to the person to be searched or seized." Maryland v. Pringle, 540 U.S. 366, 371 (2003).

Defendants claim their detention for three hours after the initial stop was unreasonable and unjustified because they provided truthful identifying information, Border Patrol found no drugs or aliens inside the SUV and there were no warrants for their arrest. The Court disagrees. Less than ten minutes after BPAs stopped the SUV, the canine unit arrived to check Desrochers' minivan. The canine alerted on both the outside and inside of the van, resulting in the discovery of four hockey bags with over 200 pounds of marijuana and a backpack containing $242,410. Defendants' odd responses to BPAs' questions also justified increased suspicion. Although Cintron purchased the SUV on May 2, 2008, five days earlier according to the registration certificate, he said he bought the SUV around April 1, 2008 and could not remember whether he bought it in Vermont or Boston. The inability to recall important details about such a large purchase struck BPA Walsh as suspicious. Then Belanger told Walsh they were going to his girlfriend's house nearby, although he could not give an address. Belanger also said he was

13

in the area because he was considering attending University of Vermont – which is approximately 80 miles away in Burlington. BPA Walsh testified the Defendants were eventually separated because their stories were "conflicting and inconsistent."

Based on the totality of the circumstances, the Court finds Border Patrol's decision to detain Defendants was reasonable given the circumstances and authorized under 8 U.S.C. 1357(a)(5)(B). The detention was reasonable because the facts indicate Border Patrol had probable cause to believe Defendants were smuggling drugs with Desrochers. Border Patrol was therefore justified in transporting them to a nearby Station where they waited for DEA agents' arrival. Although Defendants were detained for almost three hours from the time the SUV was stopped until Mr. Cintron was questioned and made incriminating statements, the Court does not find the scope or duration of detention unreasonable given the circumstances. The detention was authorized under 8 U.S.C. 1357(a)(5)(B) because Border Patrol had reasonable grounds to believe Defendants were committing a felony drug offense, Border Patrol was enforcing immigration laws at the time and there was a strong likelihood Defendants would flee if Border Patrol waited for a warrant to detain them.

IV. Conclusion

For the foregoing reasons, Defendants' motions to suppress all evidence obtained and dismiss all charges are DENIED.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 13th day of July, 2009.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
Senior United States District Judge